UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:22-cr-00010-MMD-CLB-1 |
| Plaintiff, | ORDER |
| v. | |
| CHRISTINE DAWN LYNN CARSON, | |
| Defendant. | |

## I.    SUMMARY

Christine Dawn Lynn Carson was indicted on a single count of distribution of a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (ECF No. 1.) This charge is grounded on the allegations that Carson sold methamphetamine on one occasion to an undercover agent ("UC") with the Drug Enforcement Agency ("DEA"). (ECF No. 47 at 2.) Carson now moves to dismiss the indictment based on outrageous government conduct—namely that allegedly a confidential informant, with the government's knowledge, had an ongoing sexual relationship with Carson and induced her into making the drug sale.[1] (ECF No. 41 ("Motion").) As further explained below, because Carson fails to meet the "extremely high standard" for dismissal on the grounds of outrageous government conduct, the Court denies the Motion.

---

[1]The government filed a response (ECF No. 47), and Carson filed a reply (ECF No. 58). Carson sought leave to file an oversized reply, which the Court grants, given Carson's representation that the government produced extensive discovery after the filing of the Motion. (*Id.* at 1 n.1.) Carson requested an evidentiary hearing. (*Id.* at 1, 28.) The Court granted the request and held an evidentiary hearing on the Motion, where Lyon County Sheriff's Office Lieutenant Tyrell Joyner and confidential informant Paul Harlow testified, and counsel for both sides presented argument. (ECF No. 71 (the "Hearing").)

## II.      FINDINGS OF FACT[2]

The Court relies on the evidence the parties submitted in connection with the Motion, the evidence admitted at the Hearing, and witness testimony at the Hearing to construct this factual background. The Court only makes factual findings pertinent to the legal discussion that follows.

### A.      Harlow and Carson's Relationship

Paul Harlow was the confidential informant in this case. (ECF No. 41-6 at 2; ECF No. 48-1 at 4-7.) According to Harlow, before becoming a confidential informant, he met Carson in late 2020 "because [he] was selling drugs to her" while she was "very addicted." (ECF No. 41-6 at 2.) Harlow claims that he and Carson eventually started having sex, "had sex on average once a week for months," and "would sext over text messages, Facebook, and Instagram." (*Id.* at 2-3.) Harlow believes that Carson was "in love" with him and that she was his "puppet." (*Id.* at 3.) According to Harlow, he "knew [he] could get her to do anything," and Carson demonstrated that she "would do anything" for him by cleaning his house, doing his laundry, giving him money, and buying him gifts. (*Id.*)

In text message[3] exchanges between Carson and Harlow from June 2021, Carson made several offers to do favors for Harlow, such as getting him groceries and giving him cash, her EBT card, and drugs. (ECF No. 41 at 9-10; ECF No. 42 (video of Carson-Harlow messages).) In one such instance, she messaged Harlow, "I got money drugs and ebt if u need i can drop off if u want." (ECF No. 42.) In those text exchanges, Carson also mentioned that she had bought a phone for Harlow to gift his son. (*Id.*) And at different points, she messaged Harlow: (1) "I really like u. More than I should. And its not about sex. Thats just a bonus"; (2) "It wasnt about sex . . . All I wanted was to be around u"; (3) "I loved u and I go[t] to move on"; (4) "U can't even see that I had fell in love with ur ass .

---

[2]*See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").

[3]For ease of reference, the Court uses the phrases "text(s)," "text message(s)," and "message(s)" to refer interchangeably to written phone communications conducted through SMS text messaging, the Facebook messenger application, and the Instagram messenger application.

1    . . I'm stopping I can't keep hurting myself over someone who never wanted me in the

2    first place"; (5) "no matter what goes down between us I do love you"; and (6) "I meant it

3    when I said I love you." (*Id.*)

4        **B.    Harlow as a Confidential Informant**

5        After Harlow was arrested in April 2021 and taken into custody at the Lyon County

6    Jail, Lyon County Sheriff's Office ("LCSO") Lieutenant Tyrell Joyner and other officers

7    discussed with Harlow the possibility of becoming a confidential informant to receive

8    assistance with his criminal case.[4] (ECF No. 48-1 at 2; ECF No. 41-6 at 2.) Harlow

9    subsequently decided to become a confidential informant. (*Id.*) According to Joyner,

10   during such discussions, he "specifically tell[s] confidential informant prospects that [they]

11   will not try to create a drug dealer or criminal and that the case [they] work with them [on]

12   must be a legitimate drug dealer." (ECF No. 48-1 at 2.)

13       On April 23, 2021, Joyner signed Harlow up as a confidential informant. (ECF No.

14   48-1 at 2, 13-15.) Harlow completed and signed the LCSO Cooperating Individual

15   Information Form and Activation Agreement, in which he acknowledged that "[he]

16   underst[oo]d that in the course and scope of [his] activities as a [confidential informant],

17   [he is] not to entice (through friendship, sympathy, sexual favors etc.) or entrap any

18   person(s) to accomplish any criminal activity." (*Id.* at 13-17.)

19       Before Harlow began informing on Carson, he assisted law enforcement with

20   several other investigations. At the Hearing, Joyner testified that Harlow first provided

21   information on the fraud ring and related shooting that led Harlow to be arrested in the

22   first place. Harlow then provided information on a stolen motorcycle, which was eventually

23   recovered, and the case was successfully prosecuted. (ECF No. 48-1 at 3.) Harlow next

24

25

26       [4]At the Hearing, Harlow claimed that LCSO had seized his cell phone as part of
     this arrest and that LCSO still had possession of his phone. The Court directed the
27   government to verify whether LCSO had possession of any phone belonging to Harlow.
     In response, the government filed a supplemental report indicating that, according to
28   LCSO records, Harlow's phone was taken from him during his arrest on April 14, 2021
     but was not booked into evidence and was returned to Harlow upon his release from jail
     on April 16, 2021. (ECF No. 74 at 1-2.)

1   assisted law enforcement with a narcotics investigation unrelated to the one here and

2   helped conduct a controlled drug purchase. (*Id*. at 3-4.)

3        **C.    Investigation of Carson**

4        According to a DEA report, in July 2021, Harlow identified Carson as a "crystal

5   methamphetamine trafficker" by informing LCSO investigators that Carson was

6   "advertising and/or trying to sell roughly three to four ounces of crystal

7   methamphetamine." (ECF No. 48-1 at 11.) Specifically, on July 14, 2021, Harlow texted

8   Joyner a photo of what appeared to Joyner as a hand holding a large shard of

9   methamphetamine. (*Id*. at 4, 51.) Along with the photo, Harlow shared a screenshot of a

10  text that read, "I will do what u want for what u want . . there's four zips here and I even

11  fronted Sean a quarter and someone else a quarter and told them to bring me a bill for

12  each." (*Id*. at 51-52.) Harlow then texted Joyner another screenshot of messages that

13  read, "Yo I got some shit for sale / 120 a quarter of some super fire shit came in from out

14  of town." (*Id*. at 53.) Harlow shortly thereafter sent Joyner a screenshot of a Facebook

15  profile that Harlow identified as Carson's. (*Id*. at 55.) According to Joyner, Harlow later

16  shared over the phone that: (1) Carson had sent Harlow the photo of the purported shard

17  of methamphetamine and the first set of texts; and (2) someone named Cory Tyler sent

18  the second set of texts and had purchased the methamphetamine from Carson. (*Id*. at 4.)

19  Joyner claims that Harlow had sent him Tyler's texts to show him that "Carson was selling

20  the methamphetamine quickly."[5] (*Id*.)

21       Before Harlow had informed LCSO investigators of Carson's alleged drug

22  trafficking activities, the LCSO investigators "were unaware of Carson" or her relationship

23  with Harlow. (ECF No. 48-1 at 11.) Joyner confirms that "[w]hile speaking with Harlow

24  [about Carson for the first time], [he] informed him that [he] did not know who Carson

25  was." (*Id*. at 4.) According to Joyner, Harlow shared that Carson "lays low because she

26

27       [5]At the Hearing, Carson argued that Joyner was inconsistent in his testimony when
28  identifying Carson and Harlow's text messages. The Court however finds that Joyner was
    in fact consistent in his testimony about who sent which messages in the screenshots
    sent to him.

4

1  has a Felony Arrest Warrant from Nevada Parole and Probation for a drug charge" and

2  that she "was married or together with an individual named Joshua Ono." (*Id.*) Harlow

3  later informed Joyner that Carson had been pulled over in Fernley with one of her drug

4  suppliers and that she had used her sister's name during the traffic stop to avoid being

5  arrested on her outstanding warrant. (*Id.* at 5.) Using that information, Joyner verified that

6  law enforcement had indeed conducted that traffic stop, consistent with Harlow's

7  information. (*Id.*)

8  **1.     Whether Harlow Told Joyner that Carson Was Not a Drug Dealer**

9  According to Joyner, Harlow explained that "Carson ha[d] been selling large

10  amounts of methamphetamine in Fernley . . . because she ha[d] a very good supplier out

11  of California." (*Id.* at 4.) In contrast, Harlow asserts in his declaration that he had told

12  Joyner that Carson "wasn't a drug dealer" but that "she would be able to get drugs if [he]

13  asked." (ECF No. 41-6 at 3.) But Joyner claims that Harlow never told him that "Carson

14  was not a drug dealer, or was not 'in the game.'" (ECF No. 48-1 at 6.)

15  Regarding whether Harlow told Joyner that Carson was not a drug dealer, the

16  Court finds Joyner credible and Harlow not credible. Joyner's testimony at the Hearing

17  that Harlow never told him that Carson was not a drug dealer was consistent throughout

18  the Hearing and with his declaration and text messages with Harlow. On the other hand,

19  Harlow's testimony at the Hearing on this issue was inconsistent. When first asked if he

20  told Joyner that Carson was not a drug dealer, he testified that he did not think so because

21  he would have "played both sides" on that. He later testified that he may have told Joyner

22  that Carson was a drug dealer and that he told Joyner "whatever it took" to help his own

23  case. Then, after Harlow was shown the portion of his declaration where he stated he told

24  Joyner that Carson was not a drug dealer, he answered "correct" twice when asked if he

25  told Joyner that Carson was not a drug dealer. His flipped testimony supports a finding of

26  lack of credibility.

27  Moreover, Harlow testified that he knew he had to give useful information to law

28  enforcement to obtain any benefit of getting his criminal case resolved. It therefore would

not have made sense for Harlow to affirmatively tell Harlow that Carson was not a drug dealer, particularly in the context of Harlow providing useful information on drug trafficking. Even if Harlow would not characterize Carson as a "bona fide drug dealer," as he indicated at the Hearing, he did in fact testify that he knew Carson had the "resources" to get drugs if he asked her to. Harlow also testified that he "played both sides" and admitted to taking kickbacks from the controlled buys and not telling law enforcement. He further readily admitted that he was using methamphetamine during the relevant period of time, and the defense argued that there may be gaps in Harlow's memory due to his drug use. Based on all of this testimony, the Court finds that Harlow's testimony regarding whether he told Joyner that Carson was not a drug dealer lacks credibility.

### 2. Whether Harlow Told Joyner About His Sexual Relationship with Carson

According to Harlow, he "was having sex with [Carson] when [he] was cooperating against her." (ECF No. 41-6 at 3.) He claims that he told Joyner about his sexual relationship with Carson "from the beginning of [his] time cooperating," that he would "brag" to Joyner about having sex with Carson, and that he told Joyner "she would do anything for [him]." (*Id.*) Harlow further claims that he and Joyner talked about his relationship with Carson several times, including joking about how he was a "Casanova," and that he showed Joyner text messages from Carson that showed "she was obsessed with [him] and that she was in love with [him]." (*Id.*)

In contrast, according to a DEA report, the only information shared by Harlow to LCSO investigators about his relationship with Carson was that he was "a self-proclaimed 'ladies [ ]man' and that [ ]he believed Carson was interested in him[ ]." (*Id.* at 11.) Joyner claims that another officer made the "ladies man" comment to Harlow in the context of a "joking conversation" that had "no specific bearing to any investigation." (*Id.* at 3-4.) According to Joyner, Harlow described Carson as "naïve" and told him that she trusted him enough that there would be no issues with introducing an undercover agent to her. (*Id.* at 6.) Joyner also claims that Harlow "did not ever tell [him] that he has had or was

6

having sex with Carson" and that Harlow "described their relationship as them being friends but that she was infatuated with him and wanted to be in a relationship with him." (*Id.*) At the Hearing, Joyner also testified that Harlow never told him that Carson was his "puppet" or "pawn," never told him that Carson and Harlow were sexting, and never showed him examples of their sexting.

Regarding whether Harlow told Joyner about his sexual relationship with Carson or showed him texts demonstrating such a relationship, the Court finds Joyner credible and Harlow not credible. At the Hearing, Harlow testified that he recalls telling Joyner twice that he was having sex with Carson, at a meeting with Joyner and DEA Special Agent Kathryn Wilkinson in a truck shortly after he became an informant and on the day of the controlled purchase before the sale occurred. That first meeting in a vehicle with Joyner and Wilkinson occurred before Harlow introduced Carson to law enforcement. (ECF No. 48-1 at 3; ECF No. 41-6 at 2.) Even accepting Harlow's testimony that Joyner and Wilkinson looked through his text messages during this meeting, there is no evidence that Joyner would have seen messages from Carson in particular nor connected any of those messages if he saw them to the person that Harlow later introduced. It is also unlikely that, on the day of the controlled purchase, Harlow explicitly told Joyner that he was going to have sex with Carson later that night, given Joyner's consistent testimony throughout the Hearing that if he had known about a sexual relationship, he would have used different tactics and not involved Harlow in the controlled purchase.

Moreover, nothing in the text messages that Harlow sent to Joyner suggest any sexual relationship between Harlow and Carson. (ECF No. 48-1 at 26-138.) At most, Harlow communicated to Joyner over text that Carson was "infatuated" with him. (*Id.* at 6, 81.) At the Hearing, Joyner testified that Harlow's comments that Carson was "naïve" and "infatuated" with him did not cause concern because they were normal comments for an informant with "street smarts," and he did not interpret "infatuation" to necessarily include a sexual component. Joyner also testified that Harlow presented as "confident" and "arrogant" and that it was "not out of the ordinary" for people to do things for him.

1   Having heard Harlow testify, the Court finds that, consistent with Joyner's testimony,

2   Harlow appears to have a high opinion of himself and to be prone to exaggeration.[6] From

3   Joyner's perspective, it makes sense that he would have perceived Harlow's comments

4   about Carson being "obsessed" with him as exaggerations, particularly given that Joyner

5   knew Carson was in a long-term relationship with Ono. (ECF No. 48-1 at 4.)

6       The Court therefore finds that Joyner's testimony on this issue is credible, while

7   Harlow's testimony lacks credibility.

8       **D.    Carson's Criminal Record**

9       According to the government, on August 2, 2021, the DEA obtained a record of

10  Carson's criminal history. (ECF No. 47 at 7; Exh. 510.[7]) In pertinent part, the government

11  discovered that Carson had been convicted of felony possession of a controlled

12  substance in California in 2005, arrested multiple times in California between 2007 and

13  2010 in relation to drug possession and other offenses, and arrested in 2019 for

14  misdemeanor possession of drug paraphernalia and felony possession of a controlled

15  substance in Lyon County, Nevada. (*Id.*) During the Hearing, Joyner confirmed that after

16  he learned about and positively identified Carson, law enforcement ran her criminal

17  history, and he recalled that her criminal history was "drug related."

18      **E.    August 4, 2021 Controlled Purchase**

19      In late July and early August 2021, Harlow, "at the direction of controlling

20  investigators, arranged for a controlled purchase of a quarter pound of crystal

21  methamphetamine from [Carson], to be made by [the UC]." (ECF No. 41-1 at 2.) In

22

23      [6]In addition to the inconsistencies in Harlow's testimony discussed above, the
    Court finds other examples that demonstrate Harlow's tendencies for exaggeration. For
24  example, he testified that he got Carson involved because he was upset with her—she
    had promised to hire an attorney to help him when he was arrested in April 2021, but she
25  did not do as promised. Aside from what the government pointed out in cross-examination
    that Carson did not earn as much as Harlow did for him to expect that Carson would help
26  him hire an attorney, Harlow's testimony further shows that Carson did not always do
    what he asked of her.

27      [7]At the Hearing, the parties stipulated to Exhibit 510, which contains Carson's
28  criminal history. Because this exhibit was not filed during briefing of the Motion, it does
    not have a corresponding ECF number and is referred to as Exh. 510 in this order. (ECF
    Nos. 71, 72.)

1    particular, Joyner asked Harlow to speak with Carson about introducing her to the UC,

2    which he did, and Carson agreed to meet the UC. (ECF No. 48-1 at 6.) According to

3    Harlow, he asked Carson to get drugs for "a guy [he] worked with" and asked her to do it

4    "as a favor to [him]." (ECF No. 41-6 at 3.) Harlow claims that "[t]he drugs [he] asked her

5    for were way more than anything she had ever had" and that he "knew she would do it

6    since [he] asked." (*Id.* at 4.) According to Joyner, "Harlow did not tell [him] that Carson

7    agreed to make the sale because she loved him or for any other reason than making

8    money." (ECF No. 48-1 at 6.)

9         Based on screenshots of text messages between Harlow and Carson that were

10   sent to Joyner, he "did not see any indication that Carson was hesitant to make the

11   introduction." (*Id.*) On July 29, 2021, Harlow sent Joyner a screenshot of messages, in

12   which he texted Carson, "So a partner of mine out of Reno is looking to get 2 for $700

13   would you be willing to drive to USA parkway if it can all go through," to which Carson

14   responded, "Yes, that's fine." (*Id.* at 66-67.) On August 2, 2021, Harlow sent Joyner a

15   screenshot of messages, in which Carson and Harlow discussed what appeared to be

16   her source of supply and Carson also stated, "anything I can do for you let me know . . I

17   care" and "I've been thinking of u . . I miss u." (*Id.* at 69-71.) On August 3, 2021, Harlow

18   had the following conversation over text with Carson, of which he sent portions as

19   screenshots to Joyner. Harlow: Hey so can you meet USA pkwy 830ish tomorrow for qp."

20   (*Id.* at 146.) Carson: "I will ask." (*Id.* at 73, 146.) Harlow: "Dude [the UC] has been excited."

21   (*Id.* at 73, 146.) Carson: Ok." (*Id.* at 74, 146.) Harlow: "Hopefully they brought it If so trust

22   me you want to save it for this guy as consistent as you guys have been the past few trips

23   this is money making right here alone." (*Id.* at 73-74, 145.) Carson: "Ok he says yes." (*Id.*

24   at 73, 145.) Carson: "1250 4 qp / Ok so 8:30 morrow." (*Id.* at 73, 154.) Harlow: "Yes

25   please." (*Id.* at 154.) The introduction and sale was scheduled for August 4, 2021 at a

26   Burger King parking lot located at 470 USA Parkway, Sparks, Nevada. (*Id.* at 6; ECF No.

27   41-3 at 2.)

28

On August 4, 2021, Joyner and DEA Special Agent Joe DellaVolpe met with Harlow and transported him to the predetermined location. (*Id.*) Harlow called Carson and instructed her to meet in the Burger King parking lot. (*Id.* at 2-3.) At approximately 8:30 a.m., Carson arrived in a vehicle with Ono. (*Id.* at 3.) Harlow waved Carson over to the UC's vehicle, then introduced her to the UC. (*Id.*; ECF No. 48-1 at 158 (recording of sale).) Carson was carrying a red bag, and the UC asked her, "Is it in there?" (*Id.*) Carson responded "Yes" and handed the red bag to the UC. (*Id.*) The UC removed the contents of the red bag—allegedly approximately four ounces of methamphetamine, returned the red bag to Carson, and paid her $1,250.00. (*Id.*) The UC said, "If it's good, I wanna get more," to which Carson responded, "Yeah, yeah." (*Id.*) The UC then asked Carson, "Can I call you?" Carson gestured to Harlow, who said "fine with me" and remarked about his schedule. (*Id.*) Carson then said, "Yeah that's fine." (*Id.*) The UC stated, "If I buy more, can I get a better price?" Carson responded, "Probably yeah." (*Id.*) The UC lastly indicated that he would call Carson and thanked her. (*Id.*)

According to Harlow, Carson "only went through with [the sale] because [he] was there." (ECF No. 41-6 at 4.) Harlow claims he "was having sex with [Carson] when [he] set up the sale and when the sale occurred." (*Id.*) Harlow "think[s] she only sold to the [UC] because [he] asked her to, and she'd do anything for [him]." (*Id.*) Harlow states that Carson was his "pawn" and that he "feel[s] that [he] took advantage of [his] relationship with [her] to save [him]self." (*Id.*)

**F.    Undercover Agent's Post-Sale Communications with Carson**

After the controlled purchase, between August 5, 2021 and November 2, 2021, the UC communicated directly with Carson over text messages. (ECF No. 48-1 at 159-167.) The UC initially asked Carson for a pound of methamphetamine on August 6, 2021. (*Id.* at 160.) Meanwhile, Harlow texted Joyner on August 7, 2021, "She's tripping on dude asking for the whole pound," to which Joyner responded that he would tell the UC to slow down. (*Id.* at 80.) Joyner then asked "if Carson was cool with everything because [he] was concerned that [they] had asked for too much too soon." (*Id.* at 6, 80.) Harlow

10

responded that Carson "was cool" and he would "ensure his confidence in [the UC]" but that they should lower the amount. (*Id.*) Harlow also added, "Remember she is truly infatuated with me also. I had much persuasion with her." (*Id.* at 6, 81.) According to Joyner, he perceived that as a "typical arrogant comment" made by Harlow, and it "did not change [his] opinion that Carson was selling methamphetamine." (*Id.* at 6.)

Carson eventually agreed to the UC's ask but subsequently explained that she was unable to get the drugs unless the UC was willing to go with her to Richmond to get them. (*Id.* at 160-161.) The UC communicated that he was unable to make the trip and continued to ask for the pound of methamphetamine. (*Id.* at 161-162.) The UC indicated that if Carson could not bring him back a pound, he would "take whatever [she] ha[s]." (*Id.* at 162.) At that point, Carson told the UC to go through Harlow going forward. (*Id.* at 163.) The UC continued to insist that he would "take whatever [Carson] ha[d] on hand," to which she responded that she was "going through [her] dead mom's stuff" and would not be back until a later date. (*Id.*)

Almost a week later, the UC contacted Carson again. (*Id.*) Carson responded that she could sell him "[m]aybe half of what [he] wants." (*Id.*) Shortly thereafter, Carson communicated that "[a]fter thinking about it [she was] not selling anything anymore" because "too many people [had her] name in their mouth." (*Id.* at 164.) The UC asked Carson to connect him with "[her] guy in [R]ichmond," to which Carson agreed, but those plans did not pan out. (*Id.* at 164-165.) The UC reached out a few more times to Carson who responded again that they would need to go to Richmond to get the drugs. (*Id.* at 166.)  She later indicated that she had a half-pound of methamphetamine and asked the UC how much he wanted to pay for it. (*Id.*) Carson and the UC appeared to agree on a price, but then Carson stopped responding to the UC's messages, so the sale never occurred. (*Id.* at 167.)

### G.    Carson's Post-Arrest Interview

On January 12, 2022—about five months after the controlled purchase—Wilkinson, Joyner, and LCSO Detective Wayne Hawley interviewed Carson while she

11

was in custody at the Yerington Jail Facility after being arrested for charges unrelated to those at issue here. (ECF No. 48-1 at 168-187 (post-arrest interview report and audio recording).) Carson stated that on three occasions over the past year, a drug supplier from Richmond, California would bring methamphetamine to Nevada, and Carson would "get rid of it" for him. (*Id.* at 170.) Carson informed Wilkinson that the largest amount she had "gotten rid of" for that drug supplier was a half-pound of methamphetamine for $2,200 and that, on the other two occasions, she "got rid of" quarter pounds of methamphetamine for $1,200 each. (*Id.* at 170-171.) After "getting rid of" the drugs, she would give the money to the drug supplier. (*Id.* at 182.) Carson later clarified that she had buried the half pound in the desert and ultimately lost it. (*Id.* at 180-181.) During the interview, when Wilkinson asked Carson if Harlow had ever offered to sell her anything, she responded that she "does not deal with him like that." (*Id.* at 175.) Carson also mentioned that Harlow and Ono "don't talk" because she had "slept with Harlow once." (*Id.* at 177.) At the Hearing, Joyner testified that that was his first time hearing that Carson and Harlow had had sex.

## III.   DISCUSSION

When law enforcement officers' actions are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," courts must dismiss the indictment. *U.S. v. Russell*, 411 U.S. 423, 431-32 (1973). This remedy is "limited to extreme cases in which the government's conduct violates fundamental fairness." *U.S. v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011).

"It is outrageous for government agents to (1) engineer and direct a criminal enterprise from start to finish; (2) to use excessive physical or mental coercion to convince an individual to commit a crime; or (3) to generate new crimes merely for the sake of pressing criminal charges." *U.S. v. Pincombe*, Case No. 2:14-cr-00178-JAD-GWF, 2015 WL 8480079, at *5 (D. Nev. Nov. 3, 2015) (citing *U.S. v. Black*, 733 F.3d 294, 302 (9th Cir. 2013)); *see also U.S. v. Stenberg*, 803 F.2d 422, 429 (9th Cir. 1986) ("Constitutionally unacceptable conduct includes, but is not limited to, situations where law enforcement agents employed unwarranted physical or mental coercion, where 'government agents

engineer and direct the criminal enterprise from start to finish,' and where the government essentially manufactures new crimes in order to obtain the defendant's conviction.") (internal citations omitted). Because "[t]here is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous," each case turns "on its own particular facts." *Black*, 733 F.3d at 302 (citations omitted).

To help guide this circumstance-specific inquiry, the Court considers the six factors set forth in *U.S. v. Black*:

> (1) known criminal characteristics of the defendant;
> (2) individualized suspicion of the defendant;
> (3) the government's role in creating the crime of conviction;
> (4) the government's encouragement of the defendant to commit the offense conduct;
> (5) the nature of the government's participation in the offense conduct; and
> (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

733 F.3d at 303. The first three factors address the government's conduct when initiating a sting, with factors four and five addressing the conduct of the government during the operation. *See id.* at 303-04, 308. The final factor concerns the relationship between the type of crime being investigated and whether the techniques used by the government were necessary. *See id.* at 309. The facts of the case and surrounding circumstances must be considered in their totality. *See id.* at 304 (noting that the factors "do not constitute a formalistic checklist" but rather help courts focus their analysis).

The Court finds that the *Black* factors weigh against dismissal and explains its reasoning below, first addressing what law enforcement knew about Carson before initiating the operation, then considering the government's role in creating the crime, whether the government encouraged or pressured Carson to commit the offense, and the nature of the government's participation in the offense conduct. Finally, the Court weighs the need for such tactics in prosecuting drug distribution and trafficking crimes.

### A.    Known Criminal Characteristics & Individualized Suspicion

Courts often consider the first two *Black* factors together, as they are "closely related." *U.S. v. Snagglers*, Case No. 2:14-cr-00086-JCM-PAL, 2015 WL 10436117, at

*6 (D. Nev. Dec. 30, 2015). The first factor asks "whether a defendant had a criminal background or propensity the government knew about when it initiated its sting operation." *Black*, 733 F.3d at 304. The second factor considers whether the government had reason to connect the suspected individual (or group to which the individual belonged) with the targeted offense under investigation. *See id.* Strictly speaking, law enforcement need not have individualized suspicion of a defendant's wrongdoing before conducting an undercover investigation. *See U.S. v. Luttrell*, 923 F.2d 764, 764 (9th Cir. 1991) (en banc). However, whether law enforcement "had reason to suspect an individual or an identifiable group before initiating a sting operation is an important consideration." *Black*, 733 F.3d at 304.

Carson argues the government lacked individualized suspicion of her because she was unknown to law enforcement before Harlow identified her, and even the government's own investigation of Carson before the controlled purchase indicated that she was a drug user not a drug dealer. (ECF No. 41 at 14-15; ECF No. 58 at 21-22.) The government argues that there was "[a]mple evidence show[ing] that [Carson] was already engaged in drug sales before the government's investigation," including Harlow's screenshots of Carson allegedly advertising the sale of methamphetamine, Carson's history of drug arrests and convictions, and Carson's statements in her post-arrest interview that she acted as an intermediary between dealers and buyers. (ECF No. 47 at 25-26.)

As an initial matter, because Carson's post-arrest interview occurred on January 12, 2022 (ECF No. 48-1 at 169), the government may not attribute Carson's statements made in that interview as part of its knowledge before the August 4, 2021 controlled purchase. *See U.S. v. Pedrin*, 797 F.3d 792, 797 (9th Cir. 2015) ("What the government learns only after the fact cannot supply the individualized suspicion that is necessary to justify the sting if the government had little or no basis for such individualized suspicion when it was setting up the sting"). The Court therefore does not consider the post-arrest interview as part of its analysis of the first two *Black f*actors.

14

For these factors, "the question is not whether a defendant *in fact* 'may have been predisposed to commit [the crime]' . . . [but] [r]ather, it is whether the government had reason to believe, in light of what it knew as it was setting up the sting, that a defendant was so predisposed." *Pedrin*, 797 F.3d at 797 (internal citations omitted). Here, as the government was setting up the controlled purchase, the government possessed knowledge of Carson's criminal history, as well as the information and screenshots Harlow shared with Joyner about Carson. At the time, Carson had a few non-drug-related misdemeanor convictions, several arrests related to drug possession and other offenses, and a felony conviction for drug possession. (ECF No. 47 at 7; Exh. 510.) Carson's criminal record appears consistent with someone with a drug addiction and, on its own, may be insufficient to demonstrate a propensity for drug distribution.

However, combined with Harlow's information provided to Joyner that Carson was selling methamphetamine, the Court finds the government had reason to believe Carson was predisposed to selling methamphetamine. In July 2021, Harlow sent screenshots of text messages to Joyner and later provided context for the screenshots over the phone that indicated Carson was selling three to four ounces of methamphetamine. (ECF No. 48-1 at 4, 51-55; ECF No. 41-2 at 2.) Although Harlow claims he told Joyner that Carson was not a drug dealer, the Court finds that testimony not credible, as already discussed. Even if Harlow did not believe Carson was a "bona fide drug dealer," as he stated during the Hearing, it appears he at least led Joyner to believe that Carson was selling drugs. And Joyner in fact testified that he believed Carson was selling methamphetamine based on Harlow's information.

Moreover, based on Harlow's track record at the time, Joyner had reason to believe that Harlow's information on Carson's alleged drug selling was reliable. Before informing on Carson, Harlow provided information to Joyner about a fraud ring, stolen motorcycle, and another drug trafficking scheme that proved to be reliable. (ECF No. 48-1 at 3-4). And while informing on Carson, Harlow provided accurate information about a traffic stop Carson had been involved in with one of her purported drug suppliers. (*Id.* at

5.) Accordingly, Harlow's tip, together with Carson's drug-related criminal history, created an individualized suspicion of wrongdoing to justify the undercover operation. *See Pedrin*, 797 F.3d at 797. While a close call, the Court finds the first two *Black* factors weigh against dismissal.

**B.      Government's Role in Creating the Crime, Encouraging the Defendant, and Participating in the Offense Conduct**

The Court next considers the third, fourth, and fifth *Black* factors together because they overlap. Carson argues that the government used Harlow who exerted "total control" over Carson to manufacture the crime from start to finish. (ECF No. 41 at 16-17.) The government counters that it merely "stepped into [Carson]'s ongoing drug sales business" and that the nature of the relationship between Carson and Harlow was not coercive. (ECF No. 47 at 26-27.)

For this analysis, the Court considers "whether the government approached the defendant initially or the defendant approached a government agent, and whether the government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing." *See Black*, 733 F.3d at 305 (citation omitted). Here, it is undisputed that Harlow, at Joyner's direction, approached Carson first to set up the sale between her and the UC. (ECF No. 41-1 at 2; ECF No. 48-1 at 6; ECF No. 41-6 at 2.) However, there is evidence that suggests Carson was already involved in drug distribution. In Carson's post-arrest interview, she admitted to "getting rid" of—that is, selling—methamphetamine for a drug supplier on a few occasions. (ECF No. 48-1 at 170-171.) This is corroborated by: (1) screenshots of text messages shared with Joyner before and after the controlled buy (*id.* at 70, 76, 85), in which Carson made references to individuals whom she later identified as drug dealers in her post-arrest interview (*id.* at 170-172); and (2) law enforcement's analysis of Carson's phone, which contained text messages from July 26, 2021 appearing to indicate that Carson had been working with one of those drug suppliers shortly before the controlled purchase (*id.* at 192-194).

16

1    The evidence also shows limited government participation because Carson had

2    the technical expertise and resources to commit the offense without government

3    intervention. *See Black*, 733 F.3d at 309 ("[C]ourts have examined the *necessity* of the

4    government's participation in the criminal enterprise—whether the defendants would

5    have had the technical expertise or resources necessary to commit such a crime without

6    the government's intervention."). Harlow testified at the Hearing that he knew Carson "had

7    resources" to get drugs if he asked her to. And according to Carson's own text messages

8    with Harlow and the UC, she appeared to have her own contacts to supply her with drugs

9    and knowledge of the pricing, timing, and progress of various drug shipments. (ECF No.

10   48-1 at 73-74, 160-167.)

11   Carson argues that it does not matter whether she had sold drugs before the

12   August 4, 2021 controlled buy because she would not have gone through with the sale if

13   not for Harlow's request and involvement. (ECF No. 58 at 22.) This goes towards whether

14   Harlow's relationship with Carson was coercive, which the Court finds to be a close call.

15   Harlow claims that he could get Carson to "do anything" for him. (ECF No. 41-6 at 3.)

16   While there are text messages between Carson and Harlow from June 2021 in which

17   Carson communicates several times that she loves him and offers to buy groceries for

18   him and send him money (ECF No. 42 (video of Carson-Harlow messages)), those

19   messages are unprompted by Harlow and do not necessarily indicate coercion. There is

20   also at least one text message from August 2021 in which Carson appears to decline to

21   do what Harlow asks of her (ECF No. 48-1 at 142 ("I can't now I'm sorry")). And as noted

22   earlier, the Court finds Harlow to be prone to exaggeration, and his text messages with

23   Carson regarding the drug sale do not support his claim that he asked her to get drugs

24   "as a favor to [him]" (ECF No. 41-6 at 3). In those text exchanges, he did not ask her to

25   sell drugs *for him* or as a favor to him, and the exchanges appear largely business-like

26   and transactional. (ECF No. 48-1 at 67, 73-74.)

27   Moreover, Carson did not appear reluctant when agreeing to the sale in those text

28   exchanges nor was she hesitant at the sale itself, suggesting a lack of coercion. (*Id.*; ECF

17

No. 48-1 at 158 (recording of sale).) *See also Black,* 733 F.3d at 308 (finding little evidence of coercion because "the defendants eagerly jumped at the opportunity" when the government "proposed the stash house robbery"). Carson argues that the fact that she did not continue to sell to the UC after the controlled buy demonstrates that she would not have sold drugs without Harlow's involvement. (ECF No. 41 at 17.) But according to Carson's text messages with the UC, she does agree to sell additional drugs to the UC at several points, although she ultimately backs out for various reasons, including because "too many people [had her] name in their mouth." (ECF No. 48-1 at 160-167.) And according to Harlow's exchanges with Joyner, Carson was "tripping on dude [the UC] asking for the whole pound." (*Id.* at 80.) The evidence therefore suggests that Carson became reluctant to continue selling to the UC at least in part because of the increased amount the UC was asking for and fear of apprehension, not necessarily because Harlow was no longer involved.

Even assuming Harlow's relationship with Carson was indeed coercive, the evidence suggests that the government did not have sufficient knowledge about that relationship to improperly take advantage of it. As discussed above, the Court finds credible Joyner's testimony that, before the controlled purchase, he did not know about any intimate relationship between Harlow and Carson that would have raised concerns or prompted him to investigate further.[8] Moreover, from Joyner's perspective, Carson appeared to be in a long-term relationship with Ono, who even accompanied her to the controlled sale. Ono's presence at the sale would have appeared inconsistent with the existence of a relationship between Carson and Harlow that Carson would have likely been trying to hide from Ono. Accordingly, even if Harlow exploited an emotionally intimate and sexual relationship with Carson, Harlow's conduct cannot be attributed to the government's conduct. *See United States v. Simpson*, 813 F.2d 1462, 1467 (9th Cir.

---

[8]At the Hearing, Carson argued that Joyner knew enough about Carson and Harlow's relationship to trigger a duty to inquire or investigate before using Harlow to set up the controlled buy. However, there is no independent duty to verify or investigate contemplated within the *Black* factors analysis.

1    1987) (noting that the court previously "held there was no due process violation when,

2    unbeknownst to the government, a paid informant had sex with [their target]" because

3    "the informant's use of sex . . . was not attributable to the government.").

4        The Court therefore finds that the third, fourth, and fifth *Black* factors weigh against

5    dismissal.

6    **C.    Nature of the Crime Being Pursued and Necessity for Law Enforcement's Actions**

7

8        As the final factor in the *Black* analysis, the Court considers "the need for the

9    investigative technique that was used in light of the challenges of investigating and

10   prosecuting the type of crime being investigated." 733 F.3d at 309. The Court finds that

11   drug trafficking and distribution are uniquely hard to police and that apprehending

12   suspects is difficult without the use of undercover agents and confidential informants, like

13   Harlow, who have inside knowledge and pre-existing connections to drug dealers.

14   Controlled drug purchases, like the one in this case, are often required to effectively

15   uncover individuals who are selling drugs like methamphetamine. The sixth factor

16   therefore weighs against dismissal.

17   **D.    Continued Use of Informant Who Has Sex with Target**

18       Carson additionally argues that dismissal is further warranted because pre-*Black*

19   courts have dismissed indictments based on outrageous government conduct where a

20   sexual relationship between a defendant and a government agent has been shown to

21   exist. (ECF No. 41 at 18-19.) To establish outrageous government conduct in such cases,

22   "at a minimum, the defendant must show: (1) that the government consciously set out to

23   use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its

24   own purposes upon learning that such a relationship existed; (2) that the government

25   agent initiated a sexual relationship, or allowed it to continue to exist, to achieve

26   governmental ends; and (3) that the sexual relationship took place during or close to the

27   period covered by the indictment and was entwined with the events charged therein."

28

1    *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991); *see also Simpson*, 813 F.2d

2    at 1467-68.

3           Here, Carson argues dismissal is warranted because: (1) the government knew of

4    Harlow and Carson's sexual relationship because Harlow discussed it with Joyner; (2)

5    Harlow and Carson's sexual relationship began before the offense, and he exploited that

6    relationship to further the investigation; and (3) the sexual relationship took place during

7    the investigation and the controlled purchase. (ECF No. 41 at 19-20.) The government

8    argues that, under *Black* and *Simpson*, its use of Harlow as a confidential informant was

9    appropriate because the government did not direct Harlow to induce Carson to commit

10    the crime through sexual favors. (ECF No. 47 at 28-30.) The Court agrees with the

11    government.

12           First, as already discussed, the Court finds that the government did not know about

13    Harlow and Carson's sexual relationship before or during the controlled purchase and

14    therefore could not have "acquiesced in such conduct for its own purposes," let alone

15    "consciously set out to use sex as a weapon in its investigatory arsenal." *See Cuervelo*,

16    949 F.2d at 567. Second, Harlow testified at the Hearing that he and Carson both initiated

17    the sexual relationship. But accepting Harlow's claims about their relationship as true and

18    assuming he was taking on the role of a government agent, he took advantage of the

19    relationship for his own ends to benefit himself and not for legitimate government ends.

20    As in *Simpson*, where the court found no outrageous government conduct, Harlow's

21    "official role was limited to that of introducing a willing seller of narcotics to a willing

22    purchaser," and the government here "did nothing to encourage [him] to use sex in

23    carrying out [his] assignment." *See* 813 F.2d at 1467. Accordingly, even assuming a

24    sexual relationship existed between Carson and Harlow during the investigation and

25    controlled purchase, the Court finds that Harlow's "decision to establish a [purportedly]

26    deceptive sexual and emotional relationship cannot be used to characterize the

27    *government's* conduct in this case as outrageous." *See id.*

28

At the same time, the Court acknowledges Carson's argument at the Hearing that none of the relevant cases that involve a government informant who has sex with a target, including *Simpson*, predate the #MeToo movement and therefore do not fully account for the power imbalance that can exist in relationships between men and women, such as Harlow and Carson. The Court recognizes that these types of unequal and exploitative power dynamics unfortunately exist. But even accepting Carson's arguments on their face that she was an addict, in love with Harlow who was her dealer, and manipulated by him, Harlow's deceptive conduct in which he "played both sides" cannot be imputed to the government.

In sum, the Court finds that the government's conduct in this case did not exceed the bounds of what the Ninth Circuit has found acceptable in prior cases, and Carson has failed to meet the "extremely high standard" for dismissal on the grounds of outrageous government conduct. *See Black*, 733 F.3d at 302.

## IV.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that Carson's motion to dismiss for outrageous government conduct (ECF No. 41) is denied.

DATED THIS 4th Day of August 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE